# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| CHRISTIANE MILLER, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> GRAND CANYON UNIVERSITY, INC. and GRAND CANYON EDUCATION, INC., <br><br> Defendants. | Case No. 3:20-cv-1475 |

## CLASS ACTION COMPLAINT

Plaintiff Christiane Miller, by and through her undersigned counsel, on behalf of herself and all persons similarly situated, submits this Class Action Complaint and alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to other allegations.

## INTRODUCTION AND PARTIES

1.

This action seeks monetary damages, declaratory relief, and restitution from Defendants based on their improper practice of enrolling students in professional degree programs that are not accredited such that students ultimately receive no benefit after spending substantial time taking classes and paying – or becoming indebted for – thousands of dollars in tuition.  Grand Canyon aggressively markets its academic programs to potential students using "advisors" who are actually financially-motivated salespeople who push prospective students to take courses even when the courses will not meet the students' needs.  No student should ever be enrolled in a

course of study which Grand Canyon University knows will not be accepted due to the program's lack of accreditation.  Moreover, the federal government – which funds nearly all tuition for Grand Canyon University students – should not be wasting hundreds of millions of dollars each year on unaccredited degree programs which do not advance students.

2.

Christiane Miller is a citizen of the State of Texas.  Ms. Miller enrolled in Grand Canyon's Master of Education program in hopes of becoming a certified teacher.  Ms. Miller enrolled in this program based on explicit assurances from a Grand Canyon recruiter that the program was fully accredited in Texas.  This representation, along with many others made to Ms. Miller during the enrollment process, turned out to be completely false.  Even worse, Ms. Miller was not able to transfer the course credits to another reputable program.  Thus, she has not been able to receive any benefit from her time at Grand Canyon.  Ms. Miller used federal student loans to fund her Grand Canyon tuition.  She is now obligated to repay these loans.  Ms. Miller still cannot believe that Grand Canyon has done this to her and so many other students.

3.

No student would ever knowingly enroll in a non-accredited professional degree program that does not serve their goals.  The only way this occurs is through the active, intentional, and institutional program of fraud and disinformation engineered by Defendants.  This case aims to obtain some measure of recompense for Grand Canyon's despicable acts.

4.

No student would ever knowingly expend hundreds or even thousands of hours taking classes and completing coursework, while becoming indebted for tens of thousands of dollars in federal student loans, in order to obtain a degree that is not accepted because the Grand Canyon

program is not accredited.  Furthermore, because accredited schools will not accept the Grand Canyon course credits, the effort and expense has been completely wasted.  Yet Grand Canyon enrolls thousands of students each year in unaccredited programs, primarily in the educational and healthcare fields.  Students are induced to spend time away from their families and jobs – often hundreds or even thousands of hours – and take out federal student loans that they will be saddled with for decades, for zero return.  The human misery caused by Grand Canyon's scheme is incalculable.

5.

Defendant Grand Canyon University, Inc. ("GCU") is an Arizona corporation registered to do business in Texas.   GCU can be served with process via its agent InCorp Services, Inc., 815 Brazos Street, Suite 500, Austin, TX 78701.

6.

Grand Canyon University was a small non-profit Christian college in Arizona until 2004 when it was sold to a for-profit company.  Investors and officers of Apollo Management and another online school, University of Phoenix – all of whom had profited handsomely from for-profit educational ventures – were brought in to run Grand Canyon.  The school grew rapidly, primarily by aggressively marketing its online programs.  Online programs are exponentially more profitable than running a brick and mortar school because expenses for teacher salaries and overhead are a small fraction of tuition.  Grand Canyon University was able to set itself apart from other online colleges based on its Christian affiliation and the fact that it had a real campus in Arizona, including sports teams.   Unfortunately, as shown below, neither the school's purported Christian affiliation nor its Arizona campus provide any benefit to online students.

3

7.

Grand Canyon University has created massive wealth for its leaders. For example, Grand Canyon President Brian Mueller consistently makes over two million dollars a year in total compensation. Further, he regularly cashes in stock options or stock awards worth millions of additional dollars. In 2019, for example, he sold nearly $5,000,000 worth of stock. Several other Grand Canyon executives have similarly excessive pay and perquisites. Together they own tens of millions of dollars worth of stock in GCU's for-profit arm. Maintaining and increasing this level of compensation and the value of their stock holdings is the driving force behind the fraudulent scheme described herein.

8.

Defendant Grand Canyon Education, Inc. ("GCE") is the publicly-traded holding company that operates Grand Canyon University. It trades on the NASDAQ exchange under the symbol "LOPE," which is based on the school's mascot, the antelope. The stock has surged in recent years and has recently traded as high as $132 per share, giving it a *market value of over $6 billion*. In 2018 alone, the company reported profits of *$229,000,000*. GCE is a Delaware corporation registered to do business in Texas and can be served with process via its agent Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

9.

GCE was started in 2003 before the buyout of Grand Canyon University. It now claims that it is not affiliated with Grand Canyon University, even though the two corporations share the same leadership and the vast majority of GCE's business is tied to Grand Canyon University. As described below, Grand Canyon Education has recently completed a series of complex corporate transactions which (at least arguably) leave Grand Canyon Education as a for-profit educational

4

services company and Grand Canyon University as a "non-profit" school. These moves were made in part to mislead prospective students into thinking the school is a non-profit institution.

10.

For purposes of this case, Plaintiff accepts Defendants' oft-repeated assertion – which they have verified to federal regulators under oath – that they are not affiliates. Grand Canyon Education employs the marketing and recruiting army which performs the "dirty work" of misleading potential students into signing up for professional programs that are not accredited in the relevant states. It cannot be disputed that Grand Canyon University is fully aware of, and indeed an active participant, in the scheme outlined herein. After all, Brian Mueller serves as both the President of GCU and – shockingly – as the President, Chairman, and CEO of GCE.[1]

11.

Collectively, Defendants will sometimes be referred to hereinafter as Grand Canyon for ease of reference.

**JURISDICTION AND VENUE**

12.

This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which explicitly provides for the original jurisdiction of the federal courts of any class action in which any

---

[1] The 2018 Annual Report of GCE to the Securities and Exchange Commission acknowledges this conflict as follows:

> Mr. Brian E. Mueller has served as the Chief Executive Officer of the Company since 2008, the Chairman of the Board of the Company since 2017 and the President of the University since 2012. The Board of Directors of the Company and the board of trustees of GCU have each determined that Mr. Mueller should retain those roles. Accordingly, Mr. Mueller will remain the Chairman of the Board and Chief Executive Officer of the Company and will continue to serve as the President of GCU.

member of the class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate sum of $5,000,000.00, exclusive of interest and costs.

13.

Plaintiff alleges that the total claims of individual Class Members in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §§ 1332(d)(2) and (6).   Plaintiff is a citizen of the State of Texas, whereas Defendants are citizens of Arizona and Delaware for purposes of diversity.   Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).   Furthermore, Plaintiff alleges that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than Texas, where this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

14.

Venue is proper in the Northern District of Texas pursuant to the facts described above. GCU and GCE have registered to do business here and do indeed conduct massive business activity in this District.

## PROCEDURAL BACKGROUND

15.

Plaintiff was originally a Plaintiff in a lawsuit filed against Defendants on or about October 1, 2019 in the U.S. District Court for the Northern District of Georgia, Atlanta Division, in a case styled *Austin v. Grand Canyon University, Inc., et al.*, Case No. 1:19-cv-03734-SCJ.

16.

On May 11, 2020, the District Court in *Austin* issued an order dismissing the claims of Ms. Miller for lack of jurisdiction.  The court essentially held that Grand Canyon could be sued

in the state where a student resides or in its home jurisdiction, but Ms. Miller's claims would not be heard in Georgia.

17.

Therefore, Plaintiff hereby promptly renews her claims against Defendants.

**GENERAL FACTUAL ALLEGATIONS**

18.

GCU is a rapidly growing for-profit college. Defendants recently engaged in some corporate trickery, however, in order to claim that GCU is a "non-profit." The transactions are vaguely described in GCU's Annual Report for 2018 as follows:

> On July 1, 2018, the Company sold the University to Grand Canyon University, an independent Arizona non-profit corporation formerly known as Gazelle University, as further described below (the "Transaction"). As a result of this Transaction, GCE became an educational services company focused on providing a full array of support services to institutions in the post-secondary education sector.

The Annual Report then continues for thousands of words to describe the ornate details of how a multi-billion dollar business can justify calling itself a non-profit. Suffice it to say that GCU continues to be a for-profit business in all substantive respects.

19.

That GCU is by no means a true non-profit is proven on page 45 of the same 2018 Annual Report which listed $229 million in profits:

|  | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|
| Net income [in millions] | $229,011 | $203,319 | $148,514 | $131,411 |
| Earnings per common share |  |  |  |  |
| Basic | $4.81 | $4.31 | $3.22 | $2.86 |
| Diluted | $4.73 | $4.22 | $3.15 | $2.78 |

Plainly, GCU is a cash machine for its owners and executives and the profits are rapidly climbing every year.

20.

In order to keep profits climbing, however, GCU needs to sign up more and more students.  In 2018, enrollment climbed from 90,297 to 97,369.  This followed an even larger increase in student enrollment as described in 2017 Annual Report:

> Our enrollment at December 31, 2017 was approximately 90,300, representing an increase of approximately 10.2% over our enrollment at December 31, 2016.  Our net revenue and operating income for the year ended December 31, 2017 were $974.1 million and $282.8 million, respectively, representing increases of 11.5% and 19.2%, respectively, over the year ended December 31, 2016.  Our net revenue and operating income for the year ended December 31, 2016 were $873.3 million and $237.2 million, respectively, representing increases of 12.2% and 12.8%, respectively, over the year ended December 31, 2015.

This means GCU is growing each year by the size of a mid-sized university.  The need to grow profits – and therefore the student population – has led to the recruitment practices at issue in this case.

21.

The vast majority of GCU students are online students who never set foot on the school's Arizona campus.  According to Defendants' 2017 financial reporting, for instance:

> At December 31, 2017, we had 90,297 students enrolled in our courses, of which 71,455, or 79.1%, were enrolled in our online programs, and 18,842, or 20.9%, were enrolled in our ground programs.  Of our students in online programs, which were geographically distributed throughout all 50 states of the United States, and Canada, and in professional studies programs, 86.1% were age 25 or older.  Of our traditional on-campus students, 95.6% were under age 25 and, although we draw students from throughout the United States, a majority were from Arizona.

With 7,000 more students added in 2018, and only 20,000 students at the Arizona campus, GCU now has over 80,000 online students.  Indeed, a recent GCU press release from August 19, 2019

confirmed that the school has more than 80,000 online students. Each online student who enrolls at GCU results in an average of over $3,000 in annual profit for Defendants.

22.

The most important part of Defendants' operation is the highly automated system of obtaining federal student loans and grants. Defendants concede that over 71% of GCU's funding comes from the federal government:

> During fiscal 2017 and 2016, we derived approximately 71.5% and 72.3%, respectively, of our net revenues (calculated on a cash basis in accordance with Department of Education standards currently in effect) from tuition financed under the Title IV programs. The primary Title IV programs that our students receive funding from are the Federal Direct Loan program or FDL Program, and the Federal Pell Grant, or Pell, Program.

Many students are not even aware that the school is procuring loans on their behalf. Before they know it, they are tens of thousands of dollars in debt without ever being informed of the total amount of debt that they are accruing. GCU employees are taught to gloss over the details of loans that they procure for students. For example, they rarely provide the total amount of debt accrued or offer any information on the anticipated amount or duration of loan payments. Since loan repayments do not begin until students either graduate or quit the program, most students are not aware of the enormity of the debt burden they are assuming as a GCU student.

23.

Over half of GCU's more than 80,000 online students are working adults seeking master's or doctoral degrees in order to advance in their profession. Most such students must graduate from an accredited program to gain the benefit they are seeking from schooling. Most notably, degrees in education and healthcare are not accepted by employers or governmental entities (such as school systems or state professional standards boards) unless accredited.

24.

Defendants have asserted that the problem with their degree programs is not that they are "unaccredited" but rather that they are not approved for professional licensure in various states. This distinction is merely semantics and Plaintiff will continue to use the term "accreditation," which is the generally accepted term.  Although Grand Canyon University is accredited for purposes of a general education, most of its professional graduate programs are not.  As shown below, Defendants regularly use this distinction to trick students.  The concept of "programmatic accreditation" – the need for individual programs to be separately accredited – is well known to Defendants, however, and has been conceded in a recent Annual Report of Grand Canyon Education, Inc.:

> GCU holds a number of programmatic accreditations related to the conduct of specific programs of the college.  Other colleges and universities depend, in part, on an institution's accreditation (institutional, and, in some cases, programmatic) in evaluating transfers of credit and applications to graduate schools.  Employers rely on the accredited status of institutions when evaluating candidates' credentials, and students and corporate and government sponsors under tuition reimbursement programs look to accreditation for assurance that an institution maintains quality educational standards.

2018 Annual Report, p. 16.

25.

In order to maintain its high level of profitability, GCU simply cannot devote the level of resources which are required to obtain accreditation in many fields.  For example, GCU's online professors are generally not paid enough to make GCU their full-time job.  GCU leaders have confirmed that faculty compensation is approximately 15% of tuition, not 70% like most colleges and universities.  GCU instructors generally work another job (or multiple other jobs) and teach at GCU "on the side."  Most of them do not acknowledge their work as a GCU "professor" on their résumés or LinkedIn pages.  As a result of the low pay and need for other full-time

employment, GCU faculty are not able to complete the tasks expected of faculty by many accrediting agencies, such as: preparation of proper course outlines and materials; delivering tailored lectures and answering student questions; and assisting students with the material at regularly-scheduled times.  As must be expected based on GCU's low expenditure on faculty, the school is not able to hire and retain excellent professors.  In addition to low pay, GCU and GCE also offer no benefits to the vast majority of instructors, such as no possibility for tenure, no pension or 401(k) matching, and no health insurance coverage.  Faculty quality understandably suffers as a result.

26.

GCU also does not provide students and faculty with the level of resources deemed essential by many accrediting agencies.  In addition to poor faculty pay, and negligible benefits, training and support does not meet minimum standards.  Class materials are also substandard, often amounting to links to Internet-based websites and information.  "Hands on" work is impossible or, at the very least, much less of an emphasis than in most accredited programs.

27.

Testing and other performance evaluations are not reputable at GCU.  Many students complain that grading in courses is random with the main emphasis on keeping students at GCU, even when they do not show knowledge of the coursework.

28.

GCU students also often do not have the requisite level of educational background to meet standards established by most accrediting agencies.  GCU accepts nearly every student.  Many students enroll in graduate programs without basic language skills.  GCU, however, does not offer remedial programs to help professional students get "up to speed."  Accrediting

11

agencies are well aware that the level of student preparation is below standard and that even those students who are capable of excelling cannot benefit from interaction with other similar students.

29.

A good illustration of GCU's lack of concern for any standards in accepting students into its online programs is its recruitment of criminals in jail and recently released from jail. As long as such persons can obtain federal student loans, GCU will recruit and enroll them. Other students – whose contact information is often shared with these felons – are not informed that their fellow students are felons.

30.

GCU is also notorious for accepting Spanish-speaking students for coursework that is taught in English and for which no translation services are provided. Once again, the only deciding factor for GCU's recruiters is whether the student can obtain federal student loans.

31.

For these and numerous other reasons, accrediting agencies justifiably have not accredited many GCU professional degree and certificate programs and do not accept GCU degrees or coursework.

32.

Without accreditation, GCU online degree programs are worthless to students in most fields. The largest group of GCU online students are in the education field. Teachers and other education professionals seek graduate degrees in order to increase their pay and improve their chances for promotions. In every state, however, degree programs must be accredited. Otherwise, "diploma mills" will simply issue degrees and teachers will obtain unearned benefits.

Most GCU educational master's and doctorate programs are not accredited in most states. Admittedly, GCU programs are generally accredited in Arizona and are sometimes accredited in a few other states. No teacher seeking a graduate degree in education, however, would ever knowingly invest time or money (or indebtedness) into an unaccredited GCU program of study. None of the benefits they are seeking from the degree are available to them, whereas they could just as well take classes from dozens of accredited programs.

33.

The same is true in GCU's second largest field of online graduate study, healthcare. For obvious reasons, all states require healthcare professionals to have graduated from reputable and accredited programs before beginning certain professions in healthcare, including therapists, counselors, nurses, technicians, and even physicians and dental assistants. Most GCU healthcare degree programs are not accredited in most states. As such, no student would ever knowingly invest time or money (or indebtedness) into such an unaccredited GCU program of study.

34.

GCU is well aware that it is enrolling students under false pretenses. Its recruiters – known as "advisors" – are trained not to bring up the subject with prospective students. They are taught how to not directly answer questions about accreditation if they are asked. The recruiters knowingly sign up students for programs and courses for which the student could not possibly gain any benefit.

35.

Such conduct is obviously unethical and improper but it is also illegal. The federal government prohibits GCU (and any other school receiving federal funds) from engaging in "substantial misrepresentations." As conceded in GCU's Annual Report, the Department of

Education "has defined a misrepresentation as any statement made by the institution or a third party that provides educational programs, marketing, advertising, recruiting, or admissions services to the institution that is false, erroneous or has the likelihood or tendency to deceive." Such statements can pertain to "its educational program, its financial charges, or the employability of its graduates. Defendants concede "we are subject to this regulation."

36.

As to every online student who is enrolled in a GCU program not accredited in their home state, GCU has made a "substantial misrepresentation."

37.

But GCU's illegal conduct does not stop there. In its push to sign up ever more students, it also violates federal law about recruiting students. Because federal funds are being used, the federal government insists that schools never use aggressive techniques to push students to sign up for programs. If a student does not truly desire to enter a program – on their own and without cajoling from GCU – a recruiter should not enroll the student. The mindset at GCU is the opposite; its "advisors" are trained to push and prod students to enroll in programs that they never even contemplated before hearing from GCU. If GCU recruiters do not do so, they are either fired or do not receive bonuses and promotions. This too is a violation of federal law and regulation.

38.

 As Defendants concede on page 20 of their most recent Annual Report:

each higher education institution agrees that it will not "provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of Title IV, HEA program funds." Pursuant to this rule, we are prohibited from offering our covered employees,

14

which are those involved with or responsible for recruiting or admissions activities, any bonus or incentive-based compensation based on the successful recruitment, admission or enrollment of students into a postsecondary institution. We are also precluded from offering our covered employees that work on financial aid matters (if any), any bonus or incentive-based compensation based on the award of financial aid to students enrolled in a postsecondary institution.

39.

GCU has been caught violating this rule in the past and has paid millions of dollars to settle the complaint.   Since that settlement, GCU has attempted to use more corporate shenanigans to escape this rule.   The Department of Education has allowed some payments to "unaffiliated third parties" for recruitment activities.   GCU admits in its Annual Report that it takes the position that Grand Canyon Education, Inc. is NOT an affiliate of Grand Canyon University.   As such, it acknowledges that recruiters employed by GCE are paid incentive compensation to sign up more students.   Thus, GCU recruiters have the financial incentive and the training to enroll students in unaccredited professional degree programs.

40.

No student would ever knowingly enroll in an unaccredited professional degree program. In nearly every situation, there are literally dozens of certified programs to choose from. Likewise, no college or university of integrity would ever knowingly enroll a student in an unaccredited program.   For example, if a potential student from Texas seeks to become of physician's assistant, and the school's physician assistant program is not accredited in Texas, then the student should never be enrolled in the unaccredited program.

**PLAINTIFF'S FACTUAL ALLEGATIONS**

41.

Plaintiff stands in the shoes of thousands of other victims of GCU's improper practices. They would never have enrolled at GCU if they had known the programs they were entering

15

were not accredited.  GCU knew Plaintiff was being enrolled in programs that were worthless to them, but it proceeded to sign her up purely based on greed.

### Plaintiff Christiane Miller

42.

Ms. Miller is a citizen of Texas.  She is single mother of two boys and works two jobs to provide for her family.

43.

In March 2019, Ms. Miller began searching for online graduate degree programs that were accredited in the State of Texas.

44.

After completing and submitting an online form, Ms. Miller was contacted by a GCU advisor named Nicholas Abruzesse.  In either late March or early April 2019, Ms. Miller and Mr. Abruzesse spoke via telephone several times regarding the program.  While Ms. Miller was hesitant about her ability to complete the program given her status as a single mom, Mr. Abruzesse assured Ms. Miller that within two years she could achieve her goal of becoming a certified teacher if she signed up with GCU.  Mr. Abruzesse informed Ms. Miller that GCU's graduate programs were accredited in Texas.

45.

During their telephone conversations, Mr. Abruzesse repeatedly assured Ms. Miller that she was qualified for the graduate program and that she was also qualified to receive a Teach Grant from GCU.

46.

Ms. Miller informed Mr. Abruzesse that she had never taken the GRE or GMAT, and that during her last year of her undergraduate program her grades had suffered because her father and grandmother passed away during that time.

47.

Mr. Abruzesse assured Ms. Miller that these issues would not be an obstacle to her getting into GCU's graduate programs, and that Ms. Miller would receive a grant for financial assistance. Mr. Abruzesse told Mr. Miller that he validated everything she needed to be admitted and even walked Ms. Miller through the federal registration program as she completed the federal student loan application online.

48.

Based on Mr. Abruzesse's repeated assurances, Ms. Miller enrolled in GCU.

49.

Ms. Miller began taking courses at GCU in April 2019.

50.

In July 2019, however, Ms. Miller become aware that Mr. Abruzesse's representations were false. In July, Ms. Miller met with her field experience counselor named Sara. During Ms. Miller's telephone conversation with Sara, Ms. Miller explained that she wanted to be licensed in Texas. In response, Sara explained to that the GCU program that Mr. Abruzesse had enrolled her in could not lead to a job in Texas like she had been assured.

51.

Ms. Miller was shocked and appalled at how GCU had misrepresented the nature of the graduate degree program.  Because the program was worthless to her, Ms. Miller recently suspended her pursuit of a degree from GCU so she can evaluate what to do next now that GCU's misrepresentations have been exposed.

52.

Ms. Miller was very explicit with Mr. Abruzesse about her life as a single mother and her daily work schedule in order to provide for her family.  She would not have enrolled in GCU if she had not been misled about the program.

53.

GCU should never have pushed her to enroll – or even allowed her to enroll – in a program that failed to meet any of her needs.

## **CLASS ACTION ALLEGATIONS**

54.

Plaintiff brings this class action on behalf of herself and the following class of persons:

All Grand Canyon University students who have been enrolled in an online professional graduate degree or certificate program that is not accredited in the state where they are employed or, if not employed, where they reside.

55.

Excluded from the Class are Defendants' officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

56.

The time period for the Class is the number of years immediately preceding the date on which the Ms. Miller's original complaint was filed (October 1, 2019) as allowed by the applicable statute of limitations, going forward into the future until such time as Defendants cease their improper conduct.

57.

Numerosity:  The members of the proposed Class are so numerous that individual joinder of all members is impracticable.  Public filings by GCU show that over 80,000 of its students are online students and over 50% of online students are graduate students pursuing master's and doctoral degrees.  GCU's most popular programs are its post-graduate degrees for teachers and healthcare workers.  Thus, tens of thousands of current and former students are likely included in the Class.  The exact number and identities of the members of the proposed Class are unknown at this time and can be ascertained only through appropriate discovery.

58.

The size of the Class can also be gleaned from the hundreds of complaints lodged by students and former students with the Better Business Bureau and various online forums.  For example, this complaint was lodged with the Better Business Bureau on March 14, 2019:

> They told me that they were accredited in South Carolina and they are not.  I started class on Sunday and have been trying to get out of the school for three days.  Initially they apologized for lying to me and said that they were going to get me a refund and then someone else called me and insisted that they are accredited but I have to file for a change.  That is NOT being accredited in my state.  I was lied to and now they are trying to collect 935$ from me for dropping out of the class when I had no idea that they were not accredited in my state and they lied to me.  They told me they were.  The only reason I found out was because I saw on their website looking for information for an assignment that they are only accredited in 19 states and South Carolina is not one.  It took me three phone calls and three emails to FINALLY get out of the school and I totally feel cheated!  How can you do this to an out of state student with a low income and

then expect them to pay for your services when you lied to them from the very beginning?  That is not my fault, that is their fault for being dishonest!

59.

By way of further example, this complaint appeared on www.gradreports.com and was posted on May 3, 2018:

So I just graduated April 2018, and I received the Masters in Education leading to a credential in multiple subjects and frankly, I am highly disappointed that the school lacks communication regarding specific requirements from outside states. I live in CA and I was never told that I needed a CLAD authorization which is an authorization to teach language learners. (their SEI requirement) which caused me to add additional testing after the program ended.  Do not waste your time going here if you live in CA.  CA's schools has [sic] this authorization embedded in their teacher programs so I would go that route.  If you go here, you will end up taking additional courses which will cause you to add to your debt.  Now, I have to pay 3000 for a course in CLAD certification and add 9-12 months which I could be searching for employment.  So disappointed and sad.

60.

The same scheme has clearly been in effect for years.  This complaint was listed on www.onlinedegreereviews.org on May 4, 2016:

I am at the end of the first class that Grand Canyon University said I must take and pay for.  But, the degree I wanted was social work and I was told I could take the social work class, but I had to find somewhere to get the hours I needed as volunteer services which was 400 hours.  I called the board for social services in my area and found out that GCU is not accredited for social work.  So when I contacted my student adviser.  She told me that the degree does not lead to a license.  Of course I asked her what was the degree valid for if I can not get a license.  This was something I truly wanted to do.  To help many in the community who are less fortunate.  Now, they are telling me that I will have to pay for three classes even though I have not taken nothing but one class.  So, now I am stuck at their school that lied to me about having a relevant social worker program.  I am so disappointed and I believe that this type of fraud to students who are receiving student loans that are guaranteed by the US government should be looked into.  They should not be able to commit fraud at their leisure.

61.

This complaint was listed on www.onlinedegreereviews.org on June 16, 2014:

I live in Illinois and was assured by the recruiter that the University's program would be accepted. I contacted the state, they never responded to me. I completed the courses and earned me masters...then months later, Illinois tells me they do not recognize them. Have a masters I can't use now.

62.

Similar complaints were also detailed in the case of *Austin v. Grand Canyon University, Inc., et al.*, Case No. 1:19-cv-03734-SCJ (N.D. Ga.), as described in paragraph 15 above.

63.

<u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Plaintiff and the Class and those questions substantially predominate over any questions that may affect individual Class members.  Common questions of law and fact include, but are not limited to:

a.  Does GCU knowingly enroll students in professional programs which are unaccredited in the relevant state?

b.  Do GCU's practices amount to fraud or misrepresentation?

c.  Did GCU violate federal law or regulations?

d.  Does Arizona law apply?

e.  Were Defendants unjustly enriched as a result of their improper conduct?

64.

<u>Typicality</u>:  Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been similarly affected by the actions of Defendants. Defendants' conduct as described herein is the same or substantially the same for Plaintiff and all members of the Class.  GCU has established systematic and automated policies and practices to govern recruitment and the manner in which staff enroll students in non-accredited professional programs.  Thus, the experiences of Plaintiff are typical.

21

65.

Adequacy of Representation:  Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

66.

Superiority of Class Action:  Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class is impractical.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

67.

Risk of Inconsistent or Varying Adjudication:  Class treatment is proper and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of:  (a) inconsistent or varying adjudications with

respect to individual Class members which would establish incompatible standards of conduct for the Defendants as the parties opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impeded their ability to protect their interests.

68.

Action Generally Applicable to Class as a Whole:  Defendants, as the parties that may potentially oppose certification of the Class, have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## REQUESTS FOR RELIEF

## COUNT I: Fraudulent Omission

69.

Plaintiff restates and incorporates by reference the allegations in Paragraphs 1-68 above as though fully set forth herein.

70.

Plaintiff brings this claim individually and on behalf of all other Class members.

71.

As alleged in this Class Action Complaint, Defendants knew but intentionally failed to disclose that their online professional degree and certificate programs were not accredited in most states.

72.

Plaintiff and the other Class members were told and otherwise led to believe that the programs were accredited. GCU has trained its recruiters to masterfully deflect all questions about accreditation. For example, when prospective students ask "is this program accredited?" recruiters are taught to respond "absolutely, Grand Canyon is fully accredited," thus putting potential students at ease.

73.

Defendants knew that Plaintiff and other Class members would not knowingly sign up for unaccredited professional programs. Thus, trickery and lies of omission had to be utilized. Defendants intentionally and improperly failed to disclose the truth in order to induce Plaintiff and other Class members to enroll.

74.

The issue of accreditation was material to Plaintiff and the other Class members.

75.

Had Defendants disclosed that the programs were not accredited, Plaintiff and the other Class members would not have enrolled.

76.

Had Plaintiff and the other Class members been apprised of the true facts – that Defendants' programs were not accredited – they would not have enrolled or agreed to use federal student loans to pay tuition.

24

77.

Plaintiff and the other Class members were damaged in an amount to be proven at trial as a result of Defendants' fraudulent omission and failure to disclose the true nature of their accreditation status.

78.

Accordingly, Plaintiff seeks monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

## COUNT II: Fraudulent Misrepresentation

79.

Plaintiff restates and incorporates by reference the allegations in Paragraphs 1-68 above as though fully set forth herein.

80.

Plaintiff brings this claim individually and on behalf of all other Class members.

81.

Defendants expressly represented to Plaintiff and other Class members that the GCU online professional programs were accredited.

82.

In fact, Defendants' programs were not accredited in the states where Plaintiff and the other Class members worked or lived.

83.

Defendants also expressly represented to Plaintiff and other Class members that their program would meet the student's professional need.

84.

In fact, an unaccredited professional program leading to a degree or certificate is worthless. None of the benefits sought by a student are available for an unaccredited program; there will be no increased pay, no state license or credential, and no better job opportunities. Further, GCU class credits are not accepted by accredited programs, and thus cannot be transferred to shorten the path to an accredited degree or certificate.

85.

Defendants expressly represented to Plaintiff and the other Class members that they were entering accredited programs. By stating that the programs were accredited, GCU fraudulently misrepresented the programs.

86.

Defendants expressly represented to Plaintiff and the other Class members that their academic programs would meet the professional needs of the students. By stating that the programs would meet the needs of Plaintiff and the other Class members, GCU fraudulently misrepresented the benefits of its programs.

87.

Had GCU accurately represented that its programs were not accredited, Plaintiff and the other Class members would not have enrolled and would not have authorized any student loans to be requested on their account.

88.

Plaintiff and the other Class members were damaged in an amount to be proven at trial as a result of Defendants' fraudulent misrepresentations concerning the true nature of their professional programs.

89.

Accordingly, Plaintiff seeks monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

### COUNT III: Violation of Racketeer Influenced and Corrupt Organizations ("RICO") Act 18 U.S.C. §§ 1962(a), (c)-(d)

90.

Plaintiff restates and incorporates by reference the allegations in Paragraphs 1-68 above as though fully set forth herein.

91.

Plaintiff brings this claim individually and on behalf of all other Class members.

92.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. are each "persons" under 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property."

93.

Section 1962(a) makes it:

> unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

94.

Section 1962(c) makes it:

27

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c).

95.

Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

96.

Since at least 2013, Grand Canyon University, Inc. and Grand Canyon Education, Inc. have unlawfully increased their profits by knowingly enrolling students in professional degree and certificate programs that are not accredited. The RICO enterprise, which both Grand Canyon University, Inc. and Grand Canyon Education, Inc. engaged in, and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of persons, including Grand Canyon University, Inc., Grand Canyon Education, Inc., and other unnamed co-conspirators. That association in fact was structured by various contracts and non-contractual relationships between Grand Canyon University, Inc. and Grand Canyon Education, Inc. pursuant to which Grand Canyon Education, Inc. agreed to recruit students on behalf of Grand Canyon University, Inc. and perform various related tasks, such as obtaining student permission to apply for federal student loans, handling enrollment paperwork, and illegally incentivizing recruiters to enroll students and claim federal benefits for programs that were worthless to them.

97.

The enterprise was characterized by Defendants' false representations and omissions to prospective students about the accreditation and usefulness of their professional degree and

certificate programs, which enabled the enterprise to enroll students, gaining market share for GCU at the expense of accredited programs.

98.

The enterprise was further characterized by Defendants' false representations and omissions to prospective students which induced them to apply for, and become obligated to repay, federal student loans. It was known by Defendants that all such federal student loan funds would be wasted and that students would receive no benefit for their indebtedness.

99.

The true nature of GCU's unaccredited professional programs was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiff and the Class members.

100.

GCE's sworn filings with the Securities and Exchange Commission prove that all proceeds of the conspiracy have been plowed back into the effort to grow the size and profitability of the enterprise. The following facts are established in GCE's public filings and other documents described above:

(a) GCE has paid no dividends during the relevant time period, thus all profits are being retained to grow the enterprise;

(b) GCE's spending on advertising and marketing has increased each year (now exceeding $100,000,000 per year), thus exposing more unsuspecting students to harm;

(c)  GCE now spends more than $60,000,000 each year on Internet advertising and marketing, generating over 70,000 potential student leads each month, and thereby using illicit prior proceeds to expand the enterprise;

(c)  GCE and GCU have actually increased the number of online students enrolled every year, thus proving the success of their effort to grow the enterprise with the fraudulent proceeds of the conspiracy;

(d)  Profits are increasing every year, thus reinforcing the scheme of using all profits to grow the enterprise;

(e)  GCE has recently used tens of millions of dollars of the proceeds of the enterprise (and additional bank loans) to purchase Orbis Education Services,[2] thereby expanding its reach into new graduate degree programs and exposing even more potential students to harm; and

(f)  GCE and GCU have paid their senior executives tens of millions of dollars, thus securing the loyalty of those persons directing and growing the enterprise.

101.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. are employed by and associated with an illegal enterprise, and conspired, conducted, and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and

---

[2] It is anticipated that Orbis Education Services, LLC and other affiliates of GCE and GCU will be added as co-conspirators. GCE lists the following subsidiaries in recent public filings: Amigos de Torrejon, LLC, Casa de Amistad, LLC, El Vecino de Amigos, LLC, GC Education, Inc., La Fuente de la Comunidad, LLC, La Sonrisa de Siena, LLC, Mid-State Rental Properties, LLC, Nueva Ventura, LLC, Nuevo Comienzo, LLC, Orbis Education Services, LLC, Piedras Bonitas Inversiones, LLC, REG 5161, LLC, Rentwise Properties, LLC, and Tierra Vista Inversiones, LLC. GCE does not release other details of the activities of these entities. If discovery reveals that these entities have been funded with proceeds of the enterprise or are participating in the enterprise, Plaintiff will seek to add such entities as Defendants.

repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343, all in violation of RICO, 18 U.S.C. §§ 1962(a), (c)-(d).  These acts, committed by interstate wire and through the mails, include:

    (a)   inaccurate online marketing about unaccredited Grand Canyon programs; this effort is run by a team of GCE officers and employees out of its offices in Phoenix, Arizona;[3] Shawna Barnett is or was the Executive Director of Digital Marketing and

---

[3] In its most recent Annual Report, GCE stated that it, as opposed to GCU, serves the advertising and marketing function for the enterprise:

*Marketing and Communication services includes the following:*

·    Lead Acquisition – GCE's marketing team employs experts across a wide breadth of digital marketing channels.  These include Search Engine Optimization, Search Engine Marketing, Social Media Optimization, organic content and strategic acquisition funnels across a variety of mobile markets.

·    Digital Communications Strategy – GCE's subject matter experts utilize best-in-class technologies through marketing automation, integrated email, SMS text messaging and social media. GCE develops effective communication strategies for its client that encompass the entire student lifecycle journey from prospect through alumni.

·    Brand Identity – GCE's award-winning team of specialists have proven track records developing strong brands and ensuring the right image is exposed to the consumer. GCE specializes in storytelling shaped by logo creation, taglines, content development, and custom music.

·    Media Planning and Strategy – GCE offers full-service media planning and strategies that are built to grow sophisticated brands through traditional and digital media platforms. GCE understands today's culture consumes media and we create robust strategies that build long lasting connections with proven results.

·    Video – GCE's team of in-house video experts specialize in high-quality content expanding across a wide variety of marketing channels. Capabilities include broadcast-quality commercials, explainer videos, mini- and full-length documentaries, animations, motion graphics, and short, stackable video content for a variety of social media channels. GCE enhances its internal team with preferred partners to help offset workload.

Brad Reifschneider is or was the Assistant Director of Digital Marketing for GCE; their budget exceeds $60,000,000 annually and results in over 70,000 potential student "leads" each month; when potential students search online for accredited programs, GCE pays Google and others to have Grand Canyon listed at the top of the search results even for searches which Defendants know Grand Canyon cannot provide an accredited degree; these misleading search results and misrepresentative web sites and web pages are all presented via interstate wire transmissions; for example, the attached Exhibit 1 is a webpage presented by Defendants to show that their various Master of Education programs are accredited when they are not for the vast majority of students;

(b)    once a potential student is known to the GCE recruiting team, a recruiter/"advisor" begins a well-orchestrated series of calls, emails, and texts, all using interstate wire communications, to provide prospective online graduate students with inaccurate information about unaccredited Grand Canyon programs; even after learning from the candidate that they are seeking a degree that will be accepted in their state for certification, credentials, or professional advancement, the recruiter still pushes the prospective student to enroll in a Grand Canyon degree program that is not

---

·    Data Science and Analysis – GCE employs a team of in-house data analysis professionals who apply prescriptive analytics to facilitate important business decisions. GCE specializes in all aspects of data science, including predictive modeling, data mining and visualization to enrich today's technology and data-driven marketplace, while providing the information required for success.

accredited;[4] when potential students ask about accreditation, the recruiter provides

intentionally misleading information such as "of course Grand Canyon University is

---

[4] Defendants have conceded the importance of accreditation of all professional graduate programs, including in the most recent Annual Report of GCE which offers the following under the section entitled "Regulation":

**State Professional Licensure**

Many states have specific requirements that an individual must satisfy in order to be licensed as a professional in specified fields, including fields such as education and healthcare, and counseling. These requirements vary by state and by field. A student's success in obtaining licensure following graduation typically depends on several factors, including the background and qualifications of the individual graduate, as well as the following factors, among others:

· whether the institution and the program were approved by the state in which the graduate seeks licensure, or by a professional association;
· whether the program from which the student graduated meets all requirements for professional licensure in that state;
· whether the institution and the program are accredited and, if so, by what accrediting commissions; and
· whether the institution's degrees are recognized by other states in which a student may seek to work.

Many states also require that graduates pass a state test or examination as a prerequisite to becoming certified in certain fields, such as teaching and nursing. Many states will certify individuals if they have already been certified in another state.

Although not directly regulated by these entities, we must be mindful of the requirements placed by state professional licensure bodies on our client institutions to ensure those institutions maintain that licensure.

2018 Annual Report, pp. 15-16. Although GCE describes the problem under the heading "licensure," as opposed to "accreditation" used primarily herein, the concept in the same: a professional degree is useless if they cannot succeed "in obtaining licensure following graduation." After obtaining a Grand Canyon degree, licensure is not possible because the school and program were not "approved by the state in which the graduate seeks licensure," do not "meet all requirements for professional licensure in that state," are not "accredited." Since these defects are publicly conceded by GCE, Defendants' knowledge of the uselessness of the programs and degrees at issue cannot be seriously questioned.

fully accredited" even though they are well aware that this is untrue with regard to online professional graduate programs;

(c)    using the mails and telecommunications systems to request and receive documents from prospective students, including applications and federal student loan forms; GCE performs this function for the enterprise; for example, in its latest Annual Report, GCE concedes:

> As of December 31, 2018, GCE employed approximately 2,800 professional and administrative personnel, including technical and academic advisors, counseling advisors, marketing and communication professionals, and personnel that handle financial aid processing, information technology, human resources, corporate accounting, finance, and other administrative functions.

2018 Annual Report, p. 10.    Thus, although GCU is the federally-approved institution to receive student loan monies, all of the contact with students is handled by GCE employees.    GCE has highly automated this process such that students have no forms to fill out and sign and return to GCE.    Rather, software prepares the forms and electronically submits them to the federal government;

(d) sending and receiving thousands of statements over a number of years regarding federal student loans that were sought under false pretenses and with the most important information (whether programs were accredited) left undisclosed, omitted, and affirmatively misrepresented; such documents are sent first to students in an electronic format via the interstate wires; such documents are then forwarded to the federal government also via interstate wire communications; Plaintiff obtained federal student loans in this manner;

(e) receiving payments from students and the federal government for programs that had been misrepresented to Plaintiff and members of the Class; Defendants enrolled

students in all 50 states and charged them tuition and other fees for worthless academic programs, the payments for which flowed from those various states and the federal government back to Defendants via electronic banking transactions over interstate wireline communications systems.

102.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. profited from the enterprise, and Plaintiff and the Class members suffered because the enterprise significantly increased the amounts paid by them and for which they became indebted.  Grand Canyon University, Inc. and Grand Canyon Education, Inc. used the proceeds from this scheme to advance the scheme by funding and operating their marketing and recruiting machine, including through the use of the mails and interstate wires to contact more students, providing them misrepresentative information, including via phone, text, and email all over interstate wireline communications systems, and obtaining tuition payments and fees that offered no benefit, obtained via documents and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to the members of the Class.

103.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. conspired to defraud Plaintiff and the Class, who enrolled in unaccredited programs that were worthless to them. These programs were provided through standard practices and using uniform notices and documentation.  Grand Canyon University, Inc. and Grand Canyon Education, Inc. jointly concocted their scheme to misrepresent the programs at issue and used Grand Canyon Education, Inc. resources in an effort to violate federal law and regulation applicable to all schools that

receive federal student loan funds.  Grand Canyon University, Inc. and Grand Canyon Education, Inc. aggressively marketed these worthless professional degree and certificate programs to Plaintiff and the members of the Class.  Indeed, having settled prior litigation about illegal recruiting practices, Defendants were well aware that their methods for incentivizing recruiters violated federal law.  Rather than cease their efforts, they have doubled down in order to keep increasing the number of students and, more importantly, the amount of their federal student loan funds.

104.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. concealed their fraudulent practices in several ways: first, by using different corporate entities and third-party vendors to recruit students for unaccredited programs; second, by making sure that very few students in the unaccredited programs completed the programs, thereby greatly reducing the likelihood that the program's unaccredited status would become known the student; and third, by training recruiters, who double as student "advisors" at GCU, to misrepresent accreditation status in various ways, including by reference to GCU's general accreditation.  In Defendants' repeated communications with Plaintiff and the Class members – via email, online, phone, and mail – they always failed to provide the critical information about accreditation.

105.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. have tested their methods and practices of misrepresenting unaccredited programs and have developed strategies that they have found to improve the likelihood that prospective students and current students will not realize that their programs are not accredited.  For example, many recruiter calls with students are recorded.  These calls are studied by supervisors and the most successful methods

for misrepresenting unaccredited programs are then shared with all recruiters. Because of the recorded calls, Defendants are well aware of the active misrepresentation that is occurring and indeed encourage such efforts. Based on the financial success of the scheme for Defendants, it has been deployed more aggressively over the years and is now utilized for all unaccredited programs.

106.

To further obscure the fraudulent scheme, Defendants prominently state in marketing and advertising materials to candidates for professional degree programs that Grand Canyon University is accredited, knowing that such pronouncements mislead prospective students into thinking that their specific program is accredited.

107.

The members of the RICO enterprise all share a common purpose: to enrich themselves at Class members' expense by maximizing the revenues of Defendants by fraudulently obtaining tuition and fee revenue for unaccredited professional degree programs. Grand Canyon University, Inc. and Grand Canyon Education, Inc. both benefitted financially from their joint scheme to defraud Plaintiff and the Class members, including by sharing the tuition and fees obtained from Class members and other monies which they would not have received but for the existence of the scheme.

108.

This RICO enterprise has existed for at least six years and continues to expand and operate pursuant to agreements entered into between and among Grand Canyon University, Inc., Grand Canyon Education, Inc., and other unnamed co-conspirators. The RICO enterprise has

functioned as a continuing unit and has and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

109.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

110.

By fraudulently collecting tuition and fees to which they were not entitled, Defendants used the United States Mail and interstate electronic wires and thus committed hundreds of thousands, if not millions, of separate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.  These acts and transactions were not isolated but were related and part of the same fraudulent scheme; were directed at Plaintiff and each Class member; were committed in the same or similar manner; and resulted from the same or similar fraudulent and improper intent by Defendants.

111.

As Plaintiff has alleged, Defendants have systematically misrepresented their unaccredited programs to Plaintiff and the Class members, and the specific examples recited herein are illustrative and not exhaustive.

112.

Furthermore, Grand Canyon University, Inc. and Grand Canyon Education, Inc. continue to engage in these predicate acts and to harm the Class members on a regular basis, which

establishes a threat of long-term racketeering activity and evidences the continuity of Defendants' open-ended pattern of racketeering activity.

113.

Defendants received payment for the unaccredited programs from Plaintiff and the Class members (and the federal government on their behalf) through the United States Postal Service and interstate wire facilities. These mailings and wirings are part of the pattern of racketeering activity in which Defendants engaged. In furtherance of the scheme, Defendants committed thousands of separate mail and wire fraud violations on a periodic basis over more than six years by transmitting their federal student loan documentation, each piece constituting its own separate and distinct predicate act, through the United States mail and interstate wire facilities. Each of these violations was related because they effectuated the common purpose of the enterprise and its participants of defrauding Plaintiff and the Class by collecting tuition and fees for worthless academic programs the deficiencies of which were undisclosed, omitted, and/or misrepresented. Grand Canyon University, Inc. and Grand Canyon Education, Inc. also transferred between and among themselves, and received from Plaintiff and the Class, monetary proceeds of the enterprise, in furtherance of their scheme to defraud Plaintiff and Class members in violation of 18 U.S.C. § 1343.

114.

These related acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

115.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiff and the Class. Defendants' scheme was reasonably calculated to deceive Plaintiff and Class members, all of whom are of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the usefulness of worthless unaccredited professional degree programs. Plaintiff and Class members would not have enrolled nor paid tuition and fees but for the uniform misrepresentations by Defendants.

116.

Defendants received money from a pattern of racketeering activity and invested that money in the enterprise, and the enterprise affected interstate commerce. Furthermore, Defendants used and invested the income they received through a pattern of racketeering activity to operate the enterprise, which caused Plaintiff and the Class members to suffer damages. As noted above, the investment of the proceeds from the scheme in the enterprise enabled Defendants to perpetuate the operation of the enterprise and to continue to defraud Plaintiff and Class members, in violation of 18 U.S.C. § 1962(a).

117.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. conducted and participated both directly and indirectly in the conduct of the above-described RICO enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

118.

Grand Canyon University, Inc., Grand Canyon Education, Inc., and other unnamed co-conspirators, as noted above, conspired to violate sections 1962(a) and (c), in violation of 18

U.S.C. § 1962(d).    The agreement between Grand Canyon University, Inc. and Grand Canyon Education, Inc. is reflected by, among other things, the many written agreements between them (several of which have been described in public filings); their joint participation in the same fraudulent scheme that would not have been able to proceed without their joint participation and knowledge; and their intentional and knowing sharing of the proceeds from the scheme.

119.

Grand Canyon University, Inc. and Grand Canyon Education, Inc.'s conduct and participation in the racketeering activity described herein have directly and proximately caused Plaintiff and the Class to incur damages.

**COUNT IV: Violation of Arizona Civil RICO Act**
**A.R.S. § 13-2314.04, *et seq.***

120.

Plaintiff restates and incorporates by reference the allegations in Paragraphs 1-68 above as though fully set forth herein.

121.

Plaintiff brings this claim individually and on behalf of all other Class members.

122.

Arizona law may be deemed to apply to the claims of Plaintiff and the Class members. Arizona has adopted a RICO Act substantially similar to the federal RICO Act.  *See* A.R.S. § 13-2314.04, *et seq.*  Indeed, Arizona courts have specifically adopted federal precedents to interpret and enforce claims pursuant to Arizona's civil RICO Act.

123.

In the interest of brevity and liberal pleading, therefore, Plaintiff hereby incorporates Count III and relies on the allegations and claims therein to assert her Arizona RICO claims.

41

124.

Grand Canyon University, Inc. and Grand Canyon Education, Inc.'s conduct and participation in the racketeering activity described herein has directly and proximately caused Plaintiff and the Class to incur damages as contemplated under the Arizona civil RICO Act.

## COUNT V:  Violation of Arizona Consumer Fraud Act
## A.R.S. § 44-1521, *et seq*.

125.

Plaintiff restates and incorporates by reference the allegations in Paragraphs 1-68 above as though fully set forth herein.

126.

Arizona law may be deemed to apply to the claims of Plaintiff and Class members.  The Arizona Consumer Fraud Act ("CFA"), A.R.S. § 44-1521, *et seq*., prohibits:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

127.

The courses and programs advertised, marketed, and sold by GCU qualify as "merchandise" under the CFA.  GCU qualifies as a "person" under the CFA.

128.

A statement is "deceptive" if it has the tendency and capacity to convey misleading impressions to consumers, even if interpretations that would not be misleading also are possible. Whether a statement has the tendency to mislead is determined from the perspective of the "least sophisticated reader," in light of all that is reasonably implied, not just from what is said.  It is

not necessary for the plaintiff to show that the defendant made an affirmative misstatement. Material omissions are also actionable.  A misrepresentation causes injury where the consumer relies on it, but this reliance need not be reasonable.

129.

GCU represented to Plaintiff and the Class that GCU professional degree and certificate programs were accredited in the various relevant states when they were not.  This representation is false because the GCU programs at issue are not accredited in the states where Plaintiff and Class members worked and/or lived.

130.

GCU's misrepresentation and omission is material because no person in their right mind would spend time and money on an unaccredited program that will not be accepted by the relevant employer or licensing agency.  The value or worth of the degree or certificate is the most material factor when considering such programs.  Indeed, there is no reason whatsoever to waste time and money (or accrue indebtedness) based on professional degree programs which cannot advance professional goals.  Plaintiff and the members of the Class chose to enroll only because GCU misrepresented the programs at issue.

131.

GCU knows that its misrepresentations are false because it fields complaints from hundreds of students each year.  Under the GCU system, the same "advisors" who recruit students also continue to interact with enrolled students.  As such, advisors know that degrees are often not accredited in various states.  Indeed, GCU trains advisors in how to handle questions and complaints about accreditation issues at each phase of the relationship with the student or prospective student.

132.

GCU intended that Plaintiff and the Class members rely upon GCU's misrepresentations and omissions leading Plaintiff and Class members to choose to enroll in a GCU program instead of a program offered by an accredited institution.

133.

Plaintiff and the members of the Class were consequently and proximately injured by GCU's misrepresentation and omission when Plaintiff and the Class enrolled in a GCU program instead of a program offered by an accredited institution.

134.

GCU's pattern of misrepresentations and omissions complained of herein show that Defendants are willful, wanton, and show a reckless indifference to the interests of others. Therefore, Plaintiff and the Class are entitled to an award of punitive damages.

## COUNT VI: Intentional Misrepresentation

135.

Plaintiff restates and incorporates by reference the allegations in Paragraphs 1-68 above as though fully set forth herein.

136.

GCU represented to Plaintiff and the Class that the GCU professional programs at issue were accredited in the relevant states, as described in detail above.

137.

This representation was false because the GCU programs were not accredited at the time of enrollment by Plaintiff or Class members.

138.

GCU's misrepresentation is material because in fields that require professional licensure – such as teaching and healthcare – spending time and money on unaccredited coursework is pointless. There is literally no benefit to be derived from unaccredited courses. As detailed above, accredited programs cannot even accept course credits from transferring students from unaccredited programs.

139.

GCU knows that its misrepresentation is false because it actively trains all student-facing personnel if how to handle questions of accreditation. Specifically, employees are taught how to mislead prospective students to induce them to enroll in worthless studies and they are trained in how handle questions and concerns from enrolled students in the worthless programs.

140.

GCU intended that Plaintiff and the Class members rely upon GCU's misrepresentation because only if they enroll, or continue, in these programs does GCU receive tuition and fee income.

141.

Plaintiff and the members of the Class were unaware of the falsity of GCU's misrepresentations until after enrolling and, in many cases, until after completing the programs.

142.

Plaintiff and the members of the Class relied on the truth of GCU's misrepresentations. Plaintiff and members of the Class would not have enrolled programs not accredited in the relevant state because to do so was of no possible benefit to them and would detract from their wherewithal in time and money to complete an accredited program.

143.

Plaintiff and the members of the Class had a right to rely on GCU's representations.

144.

Plaintiff and the members of the Class were consequently and proximately injured by GCU's misrepresentation when Plaintiff and the Class enrolled in unaccredited GCU programs instead of accredited programs at other schools, thereby wasting time and money, and accruing indebtedness without receiving any benefit.

## **COUNT VII: Unjust Enrichment**

145.

Plaintiff restates and incorporates by reference the allegations in Paragraphs 1-68 above as though fully set forth herein.

146.

Plaintiff brings this claim individually and on behalf of all other Class members.

147.

As alleged in this Complaint, Defendants were unjustly enriched at the expense of Plaintiff and the other Class members, who were enrolled in programs that obviously did not meet their needs and then grossly and inequitably charged tuition which GCU knew would not result in any benefit for the students.

148.

Plaintiff and the other Class members were unjustly deprived of money obtained by Defendants as a result of their undisclosed, unfair, unscrupulous, and unconscionable recruiting and enrollment practices.

149.

It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation obtained from Plaintiff and the other Class members as a result of their wrongful conduct alleged in this Class Action Complaint.

150.

Plaintiff and the other Class members are entitled to seek and do seek restitution from Defendants as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendants by virtue of their wrongful conduct.

151.

Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

152.

Under the doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they have received, and are still receiving, without justification. Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

153.

The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Class. As needed, a constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiff and the members of the Class.

154.

Plaintiff and the members of the Class have no adequate remedy at law.

WHEREFORE, Plaintiff, on behalf of herself and the proposed Class, requests that this Court:

(a)    Certify this case as a class action and appoint Plaintiff as class representative and Plaintiff's counsel as class counsel;

(b)    Award Plaintiff and the Class actual, incidental, and consequential damages in an amount to be proven at trial, including any and all compensatory damages, treble damages, punitive damages, restitution, any applicable penalties and interest, authorized attorneys' fees and costs, and any further relief as the Court deems just, equitable, and proper;

(c)    For an award of all reasonable costs and attorneys' fees incurred by Plaintiff;

(d)    For trial by jury of all matters; and

(e)    For such other and further relief as the Court may deem just and equitable.

DATED this 8th day of June, 2020.

Respectfully submitted,

BY:    VAUGHT FIRM, LLC

_s/ Allen R. Vaught_
Allen R. Vaught
TX Bar No. 24004966

1910 Pacific Ave., Suite 9150
Dallas, TX 75201
(214) 675-8603
(214) 261-5159 (fax)
allen@vaughtfirm.com

E. Adam Webb
  Georgia Bar No. 743910
Matthew C. Klase
  Georgia Bar No. 141903
G. Franklin Lemond, Jr.
  Georgia Bar No. 141315

48

WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-9325
(770) 217-9950 (fax)
Adam@WebbLLC.com
Matt@WebbLLC.com
Franklin@WebbLLC.com

*Attorneys for Plaintiff*